## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **CHRISTY LYNN YINGST,** | : | **Civil No.  3:23-CV-430** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **MARTIN O'MALLEY,** [1] | : | |
| **Commissioner of Social Security** | : | |
| | : | |
| **Defendant.** | : | |

## MEMORANDUM OPINION

### I.    Introduction

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); see also 20 C.F.R. §404.1505(a). To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous

---

[1] Martin O'Malley became the Commissioner of Social Security on December 20, 2023. Accordingly, pursuant to Rule 25(d) of the Federal Rules of Civil Procedure and 42 U.S.C. § 405(g), Martin O'Malley is substituted for Kilolo Kijakazi as the defendant in this suit.

work or any other substantial gainful activity that exists in the national economy.  42 U.S.C. §423(d)(2)(A); 20 C.F.R. §404.1505(a). In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process to determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC").  20 C.F.R. §404.1520(a)(4).

In the instant case, the claimant, Christy Lynn Yingst, applied for child's insurance benefits, alleging that she was disabled before attaining the age of twenty-two.[2] The ALJ made it only to Step 2 of this sequential analysis before determining that the plaintiff was not disabled during this period. This finding at Step 2 that Yingst did not have a severe impairment or combination of impairments alone causes the Court to, "raise a judicial eyebrow," McCrea v. Comm'r of Soc. Sec., 370 F.3d 357, 361 (3d Cir. 2004), since "[t]he Third Circuit Court of Appeals has held that

---

[2] Yingst applied for disability insurance benefits based on the earnings of her father under 20 C.F.R. § 404.350. To receive child's benefits on the earnings of an insured person who is entitled to old-age or disability benefits under this section, a claimant must be the insured person's child; dependent on the insured; unmarried; and, if over 18-years-old, have a disability that began before he or she became 22 years old. Id.

the step two severity inquiry is a *'de minimus* screening device to dispose of groundless claims.'" Id. at 360.

But a review of the ALJ's decision further solidifies our view that this case should be remanded. Despite both medical documentation and school records from the relevant period that Yingst's diagnosed autism spectrum disorder caused her to struggle to make everyday decisions and impaired her ability to interact socially, and that she had speech and language impairments and an IQ of 70, which qualifies as borderline intellectual functioning, the ALJ wholly discounted her mental impairments of autism spectrum disorder, depression, and anxiety, and learning disorder, citing primary care examination reports of normal mood and appropriate affect and her ability to bathe, groom herself, and do laundry. Thus, supporting his opinion only with examination findings of full orientation, normal mood, and appropriate affect, ignoring school records, GAF scores, medical diagnoses, and the opinions of psychological experts, the ALJ concluded that Yingst had only mild limitations in all functional areas used to evaluate mental disorders and found her conditions to be nonsevere at Step 2.

This was error. Since we review ALJ determinations denying applications for benefits at Step 2 with close scrutiny, McCrea at 360, and an ALJ is to resolve any doubt as to whether a showing of a severe impairment at step two has been made in

favor of the applicant, <u>Velazquez v. Astrue</u>, No. 07–5343, 2008 WL 4589831, *3 (E.D. Pa., Oct. 15, 2008), the ALJ's articulation in this case was insufficient to deny benefits at Step 2. Accordingly, we will remand this case to the Commissioner for further administrative proceedings.

## II.    <u>Statement of Facts and of the Case</u>

On August 26, 2020, Christy Lynn Yingst protectively filed an application from child's insurance benefits, alleging disability beginning on her birth date, October 4, 1992. (Tr. 15). She also filed an application for Title XVI social security disability insurance benefits which was not considered in the ALJ's decision. (<u>Id.</u>) To qualify for child's insurance benefits, the claimant must have had a disability that began before the attainment of age twenty-two, thus, although Yingst was twenty-eight at the time she applied for these benefits, the disability period at issue encompassed the time between her birth and her twenty-second birthday, October 4, 1992 through October 4, 2014.[3] Her determinable impairments, as analyzed by the

---

[3] The Commissioner argues that the language of 20 C.F.R. § 404.350, which requires claimants "18 years or older" to "have a disability that began before you attained age 22" implies that the only period at issue is the period that began after she attained age 18 but before she attained age 22. Since this case hinges upon the narrow issue of whether there was evidence to meet the *de minimis* standard at Step 2, and it does not appear from the ALJ's decision that he construed the claim as encompassing only that narrow period, we consider the full record of her impairments prior to attaining the age of 22. Nonetheless, even considering the narrow period the Commissioner suggests, where the evidence shows that both before and after the

ALJ, were polycystic ovarian syndrome (PCOS), hirsutism, thyroid disorder, impaired fasting glucose, alopecia, dysthymic disorder, autism spectrum disorder, and anxiety disorder. (Tr. 19).

With respect to Yingst's impairments during the relevant disability period, the medical records are relatively sparse. Her primary care treatment notes primarily address her treatment for PCOS, hirsutism, thyroid disorder, impaired fasting glucose, and alopecia but do not specifically address her cognitive functioning with regard to her autism spectrum disorder. (Tr. 534-81; 723-807). These records do, however, indicate that she had a history  notable for autism, and a diagnosis of dysthymic disorder, required learning support, and had a Global Assessment of Functioning (GAF) score of 45-66.[4] (Tr. 22, 577, 580, 651).

---

relevant timeframe, Yingst suffered at least moderate limitations from her chronic and incurable mental impairments, the Commissioner cannot rely upon an evidentiary void to demonstrate that Yingst's impairments were not severe during that narrow gap.

[4] The Global Assessment of Functioning ("GAF"), scores are used to rate the seriousness of a mental illness. They are based on the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition (DSM-IV), but are no longer included in the most recent publication. It measures how much an individual's symptoms affect his or her daily life on a scale of 0-100. Scores in the range of 60-51 demonstrate moderate symptoms (e.g. flats and circumstantial speech, occasional panic attacks) or moderate difficulty in social occupational, or social functioning (e.g., few friends, conflicts with co-workers).

While the bulk of her relevant treatment records relate primarily to her physical conditions, with the exception of some counseling records which are mostly from the period after Yingst turned twenty-two, it is without question that her medical providers considered Yingst to have limitations caused by her mental impairments prior to attaining age twenty-two. Medical records from as early as 1999 indicate that Yingst had ADHD and was taking Ritalin, had a probable learning disability, had a GAF score of 45, had been "behind in school" and had poor coordination and balance. (Tr. 651, 668). She was sent for neurological evaluation to rule out cerebral palsy due to her walking on her toes. (Tr. 669). In February 2001, when she was nine years old, she was evaluated by neurologist Dr. Dhaduk who felt that she did not have cerebral palsy, but noted a diagnosis of pervasive developmental disorder,[5] ADHD, and learning impairments. (Tr. 670). Her mother noted that she "talked different" and concerns had been voiced at school and at home that she "gets lost," that she was socially inappropriate and did not regard the personal space of others, tended to be impulsive, and inappropriately blurted out sentences unrelated to the topic at hand. (Tr. 671). The neurologist concluded that she did not have cerebral palsy and walked on her toes as a habit. He concluded, "I

---

[5] Now known as Autism Spectrum Disorder according to the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM-5).

likewise agree that she has significant social and expressive disabilities, which can be best managed by pediatric psychiatry." (Tr. 672). He noted her history of pervasive developmental disorder and also opined she had an element of oppositional defiant disorder. (Id.)

A January 7, 2009, letter from a pediatric endocrine clinic notes that she is mildly autistic, reported depression for two years, that she could not sleep and was "on a row in the school" and had "attitude problems" including attention problems and difficulty concentrating. (Tr. 658). She was encouraged to seek psychological counseling and speech therapy. (Id.) A January 2013 treatment note from her counselor indicated that she struggled with making everyday decisions due to her autism, had difficulty focusing on follow through and struggled to identify how to express herself in a healthy manner. (Tr. 690).

Yingst's school records from the relevant period are also instructive. A May 3, 2010 IEP reevaluation report stated:

> Christy has received diagnoses of Pervasive Developmental Disorder and Asperger's disorder as documented in her educational records. She continues to meet diagnostic criteria for Asperger's disorder based on the DSM-IV including:
>
> A. Qualitative impairment in social interaction as manifested by at least two of the following:
>     1. Marked impairment in the use of multiple nonverbal behaviors such as eye-to-eye gaze, facial expression

    2. Failure to develop peer relationships appropriate to developmental level

    3. Lack of spontaneous seeking to share enjoyment

    4. Lack of social or emotional reciprocity

B. Restricted repetitive and stereotyped patterns of behavior, interest, and activities as manifested by at least one of the following:

    1. encompassing preoccupation with one or more interests

    2. inflexible adherence to nonfunctional routines

    3. stereotyped motor mannerisms

    4. persistent preoccupation with parts of objects

C. The disturbance causes impairment in social, occupational, or other areas of functioning

D. There is not significant general delay in language (used single words by 2, phrases by 3 years of age)

E. No significant delay in cognitive development or adaptive behavior

F. Criteria are not met for another Pervasive Developmental Disorder

According to IDEIA 2004, Aspergers falls under the educational disability category of Autism. Therefore, it is recommended that Christy be identified as a student with Autism, Learning Disability in math and written expression, and Speech and Language impairment and that she continue to receive the supports and services through her IEP.

(Tr. 239-40). The IEP evaluation also noted that Christy's cognitive ability was assessed to fall within the borderline mentally deficient range, she had an IQ of 70 in June 2002, was found eligible for and in need of special education services, qualified for occupational therapy to increase her fine motor and gross motor skills, and had issues with passive engagement in class, lack of motivation, and lack of concentration. (Tr. 229).

In addition to these medical records from the relevant period, the record also contains medical opinion evidence from two state agency psychological consultants, a consultative examiner, and Yingst's treating counselor, all indicating that Yingst had limitations in her mental abilities. Each of these opinions postdates Yingst attaining the age of twenty-two. However, notably, one state agency psychological consultant indicated that, during the relevant period, Yingst's neurodevelopmental disorders were "severe." (Tr. 71). Nonetheless, State agency psychological consultant Dr. Molly Cowan opined in January 2021 that there was insufficient evidence to rate Yingst's "Criteria B" limitations during the relevant period, including her ability to understand, remember, or apply information, interact with others, concentrate, persist, or maintain pace, or adapt or manage herself. (Tr. 72). Dr. Cowan also opined that Yingst currently had moderate to marked limitations in many areas of understand and memory, concentration and persistence, social interaction, and ability to adapt. (Tr. 75-79). On reconsideration, state agency psychological consultant Dr. Gavazzi also concluded there was insufficient evidence to assess Yingst's specific limitations during the relevant period but indicated that her neurodevelopmental disorders were non-severe. (Tr. 105-106).

While outside the relevant period, consultative examiner Dr. Leah Bielski also examined Yingst in 2020 and opined that, due to her cognitive impairments, anxiety,

and depression, she had moderate limitations in her ability to understand, remember, and carry out simple instructions and make judgments on simple work-related decisions, and marked limitations in her ability to understand, remember, and carry out complex instructions and make judgments on complex work-related decisions. (Tr. 767). She also opined that Yingst had moderate limitations in her ability to interact appropriately with the public, supervisors, and co-workers and respond appropriately to usually work situations and changes in a routine work setting. (Tr. 768).

Similarly, Yingst's treating counselor, Angela Krause, LSW, completed an assessment outside the relevant period, in 2021, and noted that, due to her autism spectrum disorder and major depressive disorder, Yingst had marked to extreme limitations in all areas of understanding, remembering, and applying information, moderate to extreme limitations in all areas of interacting with others, and moderate to extreme limitations in her ability to sustain concentration, persistence, or pace and adapt or manage herself. (Tr. 625-29). Although Krause's assessment was completed in 2021, when asked "as of what date do you believe your patient was subject to the above limitations," she responded, "Christy was diagnosed with autism as a child." (Tr. 629).

While the ALJ's November 8, 2021, decision lists dysthymic disorder, autism spectrum disorder, and anxiety disorder among Yingst's medically determinable impairments prior to attaining age twenty-two, the decision does not directly address these impairments or analyze the evidence with regard to Yingst psychological impairments. The ALJ's analysis ends at Step 2, when he determined that Yingst did not have any severe impairment. In reaching this conclusion, the ALJ first acknowledged Yingst and her mother's statements regarding her symptoms, noting:

> The claimant argues she was disabled by the date she attained the age 22 because of developmental issues; has insomnia; must be reminded to bathe or care for her hair; does not do chores; cannot drive; and cannot manage money. She claims she has difficulty lifting, squatting, bending, standing, reaching, sitting, kneeling, talking, climbing stairs, remembering, completing tasks, concentrating, understanding, following instructions, using her hands, and getting along with others. The claimant alleges she must rest 30 minutes after walking no more than 100 feet; does not finish what she starts, cannot handle aggression or loud noises; was in special education, and does not handle stress or changes in routine well (Hearing Testimony; 6E; 9E).

> The record includes statements from Cheryl Lynn Givler, the claimant's mother, that are largely consistent with the claimant's allegations (5E; 10E). Ms. Givler testified the claimant was in special education classes, had strange behaviors, could not do chores or empty the dishwasher, and had difficulty with mathematics. She noted the claimant has issues with sensation and light, acted out in the classroom daily, and has limited walking ability (Hearing Testimony).

(Tr. 19). The ALJ found these statements concerning the intensity, persistence, and limiting effects of Yingst's symptoms to be not entirely consistent with the other

longitudinal evidence. But the ALJ's analysis does not mention the above-summarized medical evidence or school records showing her ability to function in school was significantly limited by her autism spectrum disorder, nor did it even mention her diagnoses of autism spectrum disorder, ADHD, or learning disorder. Instead, the ALJ's analysis of the medical record focused on primary care treatment notes showing normal mood and appropriate affect and instances where she was not cooperative with her medical providers. In fact, the ALJ's analysis of the longitudinal medical record is brief:

> The record shows that the claimant, through the date she attained the age of 22, had polycystic ovarian syndrome (PCOS), hirsutism, thyroid disorder, impaired fasting glucose, alopecia, dysthymic disorder, autism spectrum disorder, and anxiety disorder (6F; 15F; 16F; 17F; 18F). Medication manages her PCOS and hirsutism (6F; 18F). Medication treats her thyroid disorder (6F). Medication manages her impaired fasting glucose (18F). There is minimal medical evidence of record the claimant received ongoing treatment for her alopecia on or before the date she attained the age 22.

> As for the claimant's statements about the intensity, persistence, and limiting effects of his or her symptoms, they are inconsistent because of the following reasons. Longitudinal treatment notes through the date the claimant attained the age of 22 show the claimant had no severe impairments. These notes generally show the claimant was in no acute distress with regular heart rate and rhythm, good airflow, lungs clear to auscultation, normal sensation, normal cranial nerves, normal muscle tone, good distal pulses, nontender abdomen, no murmurs, no swelling, no erythema, no tenderness, no cyanosis, and no edema. These notes also mostly show the claimant fully oriented with normal mood and appropriate affect (6F; 12F; 18F). A February 2001 EEG was normal (16F/21). In January 2009, the claimant "refused physical examination"

(1F/14; 16F/6). While the claimant alleges she is unable to work, a December 2010 transition plan stated the claimant's "work experiences consist of working in a library where she was responsible for newspaper circulation and shredding and also working with a custodian…. [The claimant] enjoyed both of these experiences and prefers jobs where the job duties change frequently" (2E/4). In April 2014, the claimant's primary care provider noted the claimant "refuses [medication]" (6F/43; 18F/74). In September 2014, the claimant's internist indicated the claimant "is not keen on taking multiple medications and her hirsutism is not bothersome to her at this point" (18F/69).

The claimant's allegations she has developmental issues and must be reminded to bathe are also inconsistent with her activities of daily living. At a December 2020 mental status consultative examination, the claimant stated she can dress, bathe, and groom herself; does laundry; uses public transportation; watches television; and researches languages and cultures (6F/12-13; 8F/6-7; 18F/43-44). Therefore, the undersigned finds the claimant had no severe impairments on or before she attained the age of 22.

The record also includes allegations that the claimant has cerebral palsy (1F/10). However, there is no medical evidence of record any acceptable medical source diagnosed the claimant with cerebral palsy on or before the claimant attained the age of 22. Moreover, in February 2001, the claimant's neurologist noted "I do not believe she has cerebral palsy" (16F/20). Thus, the undersigned finds the claimant's purported cerebral palsy is not a medically determinable impairment on or before the claimant attained the age of 22.

(Tr. 19-20).

The ALJ also considered the medical opinion evidence in determining at Step 2 that Yingst did not have a severe impairment. With regard to Yingst's mental functional capacity, the ALJ mischaracterized the opinions of the state agency psychological consultants, one of whom found her neurodevelopmental impairments

to be severe, but both opining there was insufficient evidence to opine on her specific mental functional abilities during the relevant time. Despite these findings, the ALJ found these opinions, one of which did not state that Yingst had no severe impairments, persuasive "insofar as they state the claimant has no severe impairments on or before the date the claimant attained the age 22." (Tr. 21). The ALJ also rejected Dr. Cowan's statements as to her current limitations as they did not pertain to the relevant period. (Id.)

The ALJ also rejected the examining opinions of Dr. Bielski and LSW Krause noting moderate, marked, and extreme limitations in all areas of psychological functioning as having little pertinence to the relevant period. (Tr. 22). The ALJ also rejected these opinions as inconsistent with examination notes showing full orientation, fair insight and judgment, and cooperative mood. (Id.) The ALJ also found her treating counselor's opinion inconsistent with her treatment notes prior to her attaining the age of twenty-two showing she was "fully oriented with normal mood and appropriate affect." (Tr. 22).

The ALJ also considered Yingst's Global Assessment of Functioning (GAF) of 45 to 55 which implies severe to moderate symptoms but rejected the use of GAF scores generally as not inherently valuable or persuasive. (Tr. 22).

14

The ALJ then considered the four broad functional areas for evaluating mental disorders known as "paragraph B" criteria, concluding in a summary fashion:

> The first functional area is understanding, remembering or applying information. In this area, the claimant has mild limitation. The next functional area is interacting with others. In this area, the claimant has mild limitation. The third functional area is concentrating, persisting or maintaining pace. In this area, the claimant has mild limitation. The fourth functional area is adapting or managing oneself. In this area, the claimant has mild limitation. Progress notes from on or before the claimant attained the age of 22 mostly show the claimant is fully oriented with normal mood and appropriate affect (6F; 12F; 18F). The claimant's activities of daily living are also inconsistent with her allegations. At a December 2020 mental status consultative examination, the claimant stated she can dress, bathe, and groom herself; does laundry; uses public transportation; watches television; and researches languages and cultures (6F/12-13; 8F/6-7; 18F/43-44). There is no medical evidence of record the claimant has inpatient mental health treatment or treatment by any mental health medication on or before she attained the age of 22.
>
> Because the claimant's medically determinable mental impairments cause no more than "mild" limitation in any of the functional areas and the evidence does not otherwise indicate that there is more than a minimal limitation in the claimant's ability to do basic work activities, they are nonsevere (20 CFR 404.1520a(d)(1)).

(Tr. 23). The ALJ's analysis ended here, when he concluded that, because Yingst did not have a severe impairment or combination of impairments, she had not been under a disability prior to attaining the age of twenty-two.

This appeal followed. On appeal, the plaintiff argues that the ALJ erred at Step 2 in failing to find any of the plaintiff's impairments to be severe. The plaintiff

15

also argues that the ALJ failed to properly analyze the opinions of Yingst's treating sources. In consideration of the longstanding Third Circuit view that the Step 2 analysis is a *de minimis* screening device, and the ALJ's failure to consider all relevant evidence or directly address Yingst's mental impairments of autism spectrum disorder, depression, and ADHD in his Step 2 determination, this case will be remanded to the commissioner for further consideration.

## III.   <u>Discussion</u>

### A.   <u>Substantial Evidence Review – the Role of this Court</u>

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record.  See 42 U.S.C. §405(g); <u>Johnson v. Comm'r of Soc. Sec.</u>, 529 F.3d 198, 200 (3d Cir. 2008); <u>Ficca v. Astrue</u>, 901 F. Supp.2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Pierce v. Underwood</u>, 487 U.S. 552, 565 (1988).  Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a

16

conflict created by the evidence. <u>Mason v. Shalala</u>, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." <u>Consolo v. Fed. Maritime Comm'n</u>, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." <u>Leslie v. Barnhart</u>, 304 F. Supp.2d 623, 627 (M.D. Pa. 2003).

The Supreme Court has recently underscored for us the limited scope of our review in this field, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. <u>T-Mobile South, LLC v. Roswell</u>, 574 U.S. ——, ——, 135 S.Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. <u>Consolidated Edison Co. v. NLRB</u>, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." <u>Ibid</u>.; <u>see, e.g., Perales</u>, 402 U.S. at 401, 91 S.Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Consolidated Edison</u>, 305 U.S. at 229, 59 S.Ct. 206. <u>See Dickinson v. Zurko</u>, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

17

Biestek, 139 S. Ct. at 1154.

The question before this Court, therefore, is not whether the claimant is disabled, but rather whether the Commissioner's finding that he is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. See Arnold v. Colvin, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence") (alterations omitted); Burton v. Schweiker, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); see also Wright v. Sullivan, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); Ficca, 901 F. Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

Several fundamental legal propositions which flow from this deferential standard of review. First, when conducting this review "we are mindful that we must not substitute our own judgment for that of the fact finder." Zirnsak v. Colvin, 777 F.3d 607, 611 (3d Cir. 2014) (citing Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005)). Thus, we are enjoined to refrain from trying to re-weigh the evidence. Rather our task is to simply determine whether substantial evidence supported the ALJ's findings. However, we must also ascertain whether the ALJ's decision meets

the burden of articulation demanded by the courts to enable informed judicial review. Simply put, "this Court requires the ALJ to set forth the reasons for his decision." Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 119 (3d Cir. 2000). As the Court of Appeals has noted on this score:

> In Burnett, we held that an ALJ must clearly set forth the reasons for his decision. 220 F.3d at 119. Conclusory statements . . . are insufficient. The ALJ must provide a "discussion of the evidence" and an "explanation of reasoning" for his conclusion sufficient to enable meaningful judicial review. Id. at 120; see Jones v. Barnhart, 364 F.3d 501, 505 & n. 3 (3d Cir.2004). The ALJ, of course, need not employ particular "magic" words: "Burnett does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis." Jones, 364 F.3d at 505.

Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 504 (3d Cir. 2009).

Thus, in practice ours is a twofold task. We must evaluate the substance of the ALJ's decision under a deferential standard of review, but we must also give that decision careful scrutiny to ensure that the rationale for the ALJ's actions is sufficiently articulated to permit meaningful judicial review.

### B.     Initial Burdens of Proof, Persuasion, and Articulation for the ALJ

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a

continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); see also 20 C.F.R. §404.1505(a). To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy. 42 U.S.C. §423(d)(2)(A); 20 C.F.R. §404.1505(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. §404.1520(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC"). 20 C.F.R. §404.1520(a)(4).

Between Steps 3 and 4, the ALJ must also assess a claimant's residual functional capacity (RFC). RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." Burnett v. Comm'r

20

of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); see also 20 C.F.R.

§§404.1520(e), 404.1545(a)(1).  In making this assessment, the ALJ considers all of

the claimant's medically determinable impairments, including any non-severe

impairments identified by the ALJ at step two of his or her analysis. 20 C.F.R.

§404.1545(a)(2).

There is an undeniable medical aspect to an RFC determination, since that

determination entails an assessment of what work the claimant can do given the

physical limitations that the claimant experiences. Yet, when considering the role

and necessity of medical opinion evidence in making this determination, courts have

followed several different paths. Some courts emphasize the importance of medical

opinion support for an RFC determination and have suggested that "[r]arely can a

decision be made regarding a claimant's residual functional capacity without an

assessment from a physician regarding the functional abilities of the claimant."

Biller v. Acting Comm'r of Soc. Sec., 962 F. Supp. 2d 761, 778–79 (W.D. Pa. 2013)

(quoting Gormont v. Astrue, Civ. No. 11–2145, 2013 WL 791455 at *7 (M.D. Pa.

Mar. 4, 2013)). In other instances, it has been held that: "There is no legal

requirement that a physician have made the particular findings that an ALJ adopts

in the course of determining an RFC." Titterington v. Barnhart, 174 F. App'x 6, 11

(3d Cir. 2006). Further, courts have held in cases where there is no evidence of any

credible medical opinion supporting a claimant's allegations of disability that "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." Cummings v. Colvin, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015).

These seemingly discordant legal propositions can be reconciled by evaluation of the factual context of these decisions. Those cases which emphasize the importance of medical opinion support for an RFC assessment typically arise in the factual setting where a well-supported medical source has identified limitations that would support a disability claim, but an ALJ has rejected the medical opinion which supported a disability determination based upon a lay assessment of other evidence. Biller, 962 F.Supp.2d at 778–79. In this setting, these cases simply restate the commonplace idea that medical opinions are entitled to careful consideration when making a disability determination, particularly when those opinions support a finding of disability. In contrast, when an ALJ is relying upon other evidence, such as contrasting clinical or opinion evidence or testimony regarding the claimant's activities of daily living, to fashion an RFC courts have adopted a more pragmatic view and have sustained the ALJ's exercise of independent judgment based upon all of the facts and evidence. See Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006); Cummings v. Colvin, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015). In either

event, once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence. Burns v. Barnhart, 312 F.3d 113, 129 (3d Cir. 2002); see also Metzger v. Berryhill, No. 3:16-CV-1929, 2017 WL 1483328, at *5 (M.D. Pa. Mar. 29, 2017), report and recommendation adopted sub nom. Metzgar v. Colvin, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017); Rathbun v. Berryhill, No. 3:17-CV-00301, 2018 WL 1514383, at *6 (M.D. Pa. Mar. 12, 2018), report and recommendation adopted, No. 3:17-CV-301, 2018 WL 1479366 (M.D. Pa. Mar. 27, 2018).

At Steps 1 through 4, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work. Mason, 994 F.2d at 1064. Once this burden has been met by the claimant, it shifts to the Commissioner at Step 5 to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC. 20 C.F.R. §404.1512(f); Mason, 994 F.2d at 1064.

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination.

23

Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Id. at 706-07. In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 433 (3d Cir. 1999).

C.    **Step 2 Analysis**

At step-two of the sequential analysis, the ALJ determines whether a claimant has a medically severe impairment or combination of impairments. Bowen v. Yuckert, 482 U.S. 137, 140-41, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987). Step 2 of this sequential analysis is often the first substantive benchmark an ALJ must address and is governed by familiar legal standards:

> With respect to this threshold showing of a severe impairment, the showing required by law has been aptly described in the following terms: "In order to meet the step two severity test, an impairment need only cause a slight abnormality that has no more than a minimal effect on the ability to do basic work activities. 20 C.F.R. §§ 404.1521, 416.921; S.S.R. 96–3p, 85–28. The Third Circuit Court of Appeals has held that the step two severity inquiry is a *'de minimus* screening device to dispose of groundless claims.' McCrea v. Comm. of Soc. Sec., 370 F.3d 357, 360 (3d Cir. 2004); Newell v. Comm. of Soc. Sec., 347 F.3d 541, 546 (3d Cir. 2003). 'Any doubt as to whether this showing has

24

been made is to be resolved in favor of the applicant.' <u>Id</u>." <u>Velazquez v. Astrue</u>, No. 07–5343, 2008 WL 4589831, *3 (E.D. Pa., Oct. 15, 2008). Thus, "[t]he claimant's burden at step two is 'not an exacting one.' <u>McCrea v. Comm'r of Soc. Sec.</u>, 370 F.3d 357, 360 (3d Cir. 2004). This step should be 'rarely utilized' to deny benefits. <u>Id</u>. at 361. Rather, ... [a]n individual should be denied benefits at step two only if the impairment he presents is a 'slight abnormality' that has 'no more than a minimal effect on [his] ability to work.' <u>Id</u>." <u>Kinney v. Comm'r of Soc. Sec.</u>, 244 F. App'x 467, 469–70 (3d Cir. 2007). Accordingly, "[d]ue to this limited function, the Commissioner's determination to deny an applicant's request for benefits at step two should be reviewed with close scrutiny." <u>McCrea v. Commissioner of Social Sec.</u>, 370 F.3d 357, 360 (3d Cir. 2004).

<u>Dotzel v. Astrue</u>, No. 1:12-CV-1281, 2014 WL 1612508, at *4 (M.D. Pa. Apr. 22, 2014). Furthermore,

> [E]ven if an ALJ erroneously determines at step two that one impairment is not "severe," the ALJ's ultimate decision may still be based on substantial evidence if the ALJ considered the effects of that impairment at steps three through five. However, where it appears that the ALJ's error at step two also influenced the ALJ's RFC analysis, the reviewing court may remand the matter to the Commissioner for further consideration. <u>See Nosse v. Astrue</u>, No. 08–[CV–1173, 2009 WL 2986612, *10] (W.D. Pa. Sept. 17, 2009).

<u>McClease v. Comm. of Soc. Sec.</u>, No. 8–CV–1673, 2009 WL 3497775, *10 (E.D. Pa. Oct. 28, 2009); <u>see also Salles v. Comm. of Soc. Sec.</u>, 229 Fed. App'x 140, 145, n. 2 (3d Cir. 2007) (citing <u>Rutherford v. Barnhart</u>, 399 F.3d 546, 553 (3d Cir. 2005)) ("Because the ALJ found in Salles's favor at Step Two, even if he had erroneously concluded that some of her impairments were non-severe, any error was harmless.").

<u>Stouchko v. Comm'r of Soc. Sec.</u>, No. 1:12-CV-1318, 2014 WL 888513, at *10 (M.D. Pa. Mar. 6, 2014). Simply put, "because step two is to be rarely utilized as basis for the denial of benefits, [ ] its invocation is certain to raise a judicial eyebrow." <u>McCrea v. Comm'r of Soc. Sec.</u>, 370 F.3d 357, 361 (3d Cir. 2004) (citing SSR 85–28, 1995 WL 56856, at *4 ('Great care should be exercised in applying the not severe impairment concept')).

**D.    <u>This Case Will Be Remanded.</u>**

In this case, the ALJ's decision to discount Yingst's mental and emotional impairments at Step 2 was erroneous, and the ALJ failed to conduct any further analysis as to her remaining RFC that could make such error harmless. Given the *de minimis* nature of this Step 2 screening requirement, in order to meet the step two severity test, Yingst's mental impairments only needed to cause a slight abnormality that has a minimal effect on the ability to do basic work activities. <u>Marks v. Saul</u>, No. 1:20-CV-194, 2020 WL 3052743, at *5 (M.D. Pa. May 18, 2020), <u>report and recommendation adopted,</u> No. CV 1:20-194, 2020 WL 3051056 (M.D. Pa. June 8, 2020). This standard is amply met by the medical records showing as early as 1999 indicate that Yingst had ADHD and was taking Ritalin, had been "behind in school" and had poor coordination and balance, (Tr. 668), a 2001 diagnosis of pervasive developmental disorder, ADHD, and learning impairments, (Tr. 670), and the

26

neurologist's conclusion at that time that "she has significant social and expressive disabilities," (Tr. 672), and subsequent treatment notes that her autism caused attitude problems, difficulty concentrating and making everyday decisions, focusing, and expressing herself in a healthy manner. (Tr. 658, 690). Most importantly, Yingst's school records, which the ALJ wholly failed to mention or analyze, indicated that her Asperger's disorder required support services through her IEP, and manifested in impairment in social, occupation, or other areas of functioning, and that her cognitive ability was assessed to fall within the borderline mentally deficient range and that she had issues with engagement in class, motivation, and concentration. (Tr. 229, 239-40). Moreover, three out of four medical experts who considered Yingst's condition opined that her mental conditions were severe and caused at least moderate limitations in her functional abilities. Given the *"de minimus"* nature of the claimant's burden at Step 2, acknowledging that "[a]ny doubt as to whether this showing has been made is to be resolved in favor of the applicant," and accepting that the claimant's burden at step two is "not an exacting one," McCrea, 370 F.3d at 360, we conclude that the ALJ erred in not considering Yingst's mental impairments to be severe at Step 2.

The ALJ's decision lists autism spectrum disorder, anxiety disorder, and dysthymic disorder as medically determinable impairments, yet the ALJ's Step 2

analysis is devoid of any mention or specific consideration of any of these mental impairments. The ALJ failed to summarize the longitudinal treatment records, did not even mention ADHD as a determinable impairment, and failed to consider Yingst's school records of her intellectual disability. The ALJ instead based his determination broadly upon examination notes that showed the plaintiff was fully oriented with normal mood and appropriate affect and her ability to dress, bathe, and groom herself. And the ALJ's brief and conclusory analysis of the "paragraph B" criteria simply did not address much of the relevant evidence. The failure to address these diagnosed conditions in considering whether Yingst was disabled was unexplained by the ALJ's decision. "In the absence of such an [explanation,] the reviewing court cannot tell if significant probative evidence was not credited or simply ignored." Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 121 (3d Cir. 2000). This was error.

Nor can this deficient Step 2 analysis be saved by the ALJ's consideration of the cumulative effects of these impairments at steps three through five, since, after concluding at Step 2 that the plaintiff's impairments were nonsevere, the ALJ concluded his analysis and did not fashion an RFC for the plaintiff. Given this series of errors, and the failure of articulation on the part of the ALJ, a remand to reconsider, and expressly address, the cumulative effects of Yingst's intellectual

impairments upon her ability to perform work related activities during the relevant period is warranted in this case. <u>Repsher v. Saul</u>, No. 1:19-CV-1718, 2020 WL 1922640, at *7 (M.D. Pa. Apr. 21, 2020)

Since the ALJ's burden of articulation is not met in the instant case, this matter must be remanded for further consideration by the Commissioner. Yet, while we reach this result, we note that nothing in this Memorandum Opinion should be deemed as expressing a judgment on what the ultimate outcome of any reassessment of this evidence should be. Rather, the task should remain the duty and province of the ALJ on remand.

## IV.   <u>Conclusion</u>

Accordingly, for the foregoing reasons, IT IS ORDERED that the final decision of the Commissioner denying these claims is vacated, and this case is remanded to the Commissioner to conduct a new administrative hearing.

An appropriate order follows.

<u>/s/ *Martin C. Carlson*</u>
Martin C. Carlson
United States Magistrate Judge

Dated: December 6, 2024

29